**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| MICHAEL QUICK,<br><br>Plaintiff,<br><br>v.<br><br>CLARK COUNTY, NEVADA, ex. rel. LAS VEGAS METROPOLITAN POLICE DEPARTMENT; PETER M. BOFFELLI, JR.,<br><br>Defendants. | Case No. 2:16-cv-01554-RFB-NJK<br><br>**ORDER**<br><br>Defendants' Motion for Summary Judgment (ECF No. 27) |

## I. INTRODUCTION

Before the Court comes a Motion for Summary Judgment filed by Defendants Las Vegas Metropolitan Police Department ("LVMPD") and Peter M. Boffelli, Jr. ("Boffelli") (collectively, "Defendants"). (ECF No. 27). For reasons that will be discussed in further detail below, the Court grants Defendants' Motion for Summary Judgment.

## II. UNDISPUTED FACTS

The Court finds the following facts to be undisputed. Plaintiff Michael Quick ("Plaintiff") was hired as a police officer with the LVMPD in 1993. His most recent position with LVMPD was SWAT Team Leader and SWAT Training Section Sergeant. LVMPD is a governmental entity responsible for law enforcement in Clark County, Nevada. Boffelli is a captain in the LVMPD and at the times relevant to this case was the lieutenant over SWAT.

In April of 2014, Federal Bureau of Land Management ("BLM") agents traveled to Bunkerville, Clark County, Nevada to execute a seizure order for cattle belonging to rancher Cliven Bundy ("Bundy"). During the following days, as BLM agents gathered the herd of cattle, Bundy utilized social media to generate support for his cause. Armed militia members descended

on Bunkerville and engaged the BLM agents with firearms, shotguns, and assault rifles. On April 12, 2014, BLM agents asked Sheriff Doug Gillespie ("Sherriff Gillespie") to provide assistance and security for their agents who were outnumbered by the militia members. Sheriff Gillespie responded to Bunkerville with uniformed police officers and a SWAT team. While Sheriff Gillespie attempted to negotiate a peaceful resolution, militia members and other anti-government people secured the high ground giving them a tactical advantage over the law enforcement officers. The media photographed these members posted on highways, overlooking the scene, with high-powered rifles pointed at the officers below.

An LVMPD SWAT officer, Russell Laws ("Laws"), who was not dispatched to Bunkerville, observed a Facebook post with a picture of an armed individual at the Bundy ranch scene. The photo depicted a person, hiding behind an overpass wall, aiming a rifle at law enforcement officers. A person acting as a spotter knelt next to the gunman. The caption on the photo read, "THE 2nd AMERICAN REVOLUTION ALMOST STARTED TODAY." Laws wrote on the post's thread, "I just wish you could see how big that guy prone with the rifles [sic] head was in the scope of the LE [Law Enforcement] Snipers [sic] .308 [rifle], don't worry, he wouldn't have felt a thing!!" Laws did not identify himself as a police officer. The bloggers were able to identify Laws as a police officer. Laws removed his remarks from the site and contacted Boffelli to advise him of the matter.

Following that incident, Boffelli summoned Laws and his supervisor, Plaintiff, to his office. Boffelli announced he was administratively transferring Laws to Patrol. Shortly thereafter, Boffelli ordered SWAT members to attend a team meeting. At that meeting, Boffelli informed the SWAT members he transferred Laws out of the unit for violating LVMPD's Social Media Policy. Laws was administratively transferred out of SWAT on May 10, 2014, although he remained an officer in the department with the ability to carry a handgun and potentially execute search warrants. Laws subsequently filed a grievance through the Las Vegas Police Protective Association ("LVPPA"), a police union, alleging his removal from SWAT was an illegal disciplinary transfer. On May 14, 2014, LVMPD refused to accept Laws' grievance and advised

him he was not entitled to file a grievance, as his re-assignment was an administrative transfer, i.e., non-disciplinary, and therefore could not be subject to a grievance.

Laws then filed a second grievance seeking arbitration of this issue. In preparation for the arbitration hearing, LVPPA investigators interviewed SWAT members including Plaintiff. Plaintiff participated in a voluntary interview with the LVPPA on June 5, 2014 at 9:27am. The interview was audiorecorded, and conducted by Detective Rory Neslund ("Neslund") and Detective Darryl Clodt ("Clodt") of the LVVPA. Plaintiff identified himself as Laws' direct supervisor. During the interview, Plaintiff was asked about the SWAT section meeting in which Boffelli commented upon Laws' violation of the Social Media Policy and subsequent administrative transfer.

Plaintiff was asked several questions about his opinion as a supervisor regarding Laws' integrity and judgment. For example, Neslund asked, "Do you feel that this incident [Laws' violation of the Social Media Policy] compromised [Laws'] integrity as a SWAT operator?" Plaintiff responded that he "looked at this [situation] . . . much like it's porn . . . . This is always going to be out there. [Laws] did something [and] . . . made a mistake and – and is it a – is it a punishable offense? Maybe, maybe so. But we never got that opportunity." When asked, "Does this incident cause you to question his judgment as a sniper or SWAT team member?," Plaintiff responded: "No. I – and I – I'm going to add this because I am the supervisor. I think it doesn't cause me to question [his judgment], especially had we been able to handle this properly. Had this been an issue where discipline was effective, immediate, and equitable . . . I think this could have been a great learning experience for both the section and for [Laws] himself." Neslund also asked Plaintiff questions about SWAT operations and staffing, such as "Is the team better off with the one less certified sniper?" and "Is the team more effective in any way without [Laws] there?" To these questions, Plaintiff responded in the negative. He stated, "I wouldn't say we're more effective. We're – we're less effective. . . ." As follow up, Neslund asked, "[W]ith him being gone under this administrative transfer, because of his effectiveness in the unit, did him leaving make that unit before more effective somehow because he's gone?" Plaintiff responded that he did not believe so. Plaintiff additionally opined "as a supervisor in SWAT" about the safety issues related

to a shortage of SWAT personnel. Prior to the interview, Plaintiff informed Boffelli that Plaintiff disagreed with the decision to administratively transfer Laws.

On July 18, 2014, Boffelli called Plaintiff and asked if Plaintiff had provided a statement to the LVPPA regarding the effectiveness and safety of SWAT. At the time, Plaintiff had not seen the transcription of his statement and responded that he did not recall making such a statement. Boffelli stated during the call that he lost confidence in Plaintiff, and that Plaintiff was "going to need to find another home." Boffelli admitted that he raised his voice and may have sworn at Plaintiff during the call. Boffelli also accused Plaintiff of being "deceitful" and a "back stabber."

On July 23, 2014, days before the scheduled arbitration hearing for Laws, Boffelli ordered Plaintiff to come to his office. Along with Boffelli, Deputy Chief Jim Owens ("Owens") was present at the meeting. Plaintiff noticed what appeared to be a recording device on Boffelli's desk. Owens told Plaintiff that the meeting was not about Plaintiff speaking with the LVPPA, but that Owens and Boffelli wanted to discuss the substance of Plaintiff's statement. Plaintiff was informed that he could obtain an LVPPA representative before answering questions. Plaintiff accepted the offer for representation, and the meeting concluded. At some point that same day, Owens, handwrote a page of notes that includes near the top: "Do we speak to Quick to determine what his thought process [was]? . . . Appearance of retaliation if we do not give him a chance to explain his thoughts." Below that text appears a checkmark next to the words "Stop process (admin transfer)" and, further down, the words "Advise Quick / [illegible] that final decision to admin transfer Quick." The note reads on the top of the second page: "Worried there is not enough to make it stick and we would lose ability to admin trans." Further, the note includes a short list of questions which reads: "Does he think what [Laws] did was wrong? What potential impact could Laws['] action have on [LVMPD]?" and the text below reads: "Go down the line – explaining our concerns[.] Do our expectations match [LVMPD] policy[?]"

Laws' arbitration hearing took place on August 5, 2014. That day, Plaintiff was ordered to Boffelli's office for a counseling session. Plaintiff attended the session with an LVPPA representative. At the beginning of the meeting, Boffelli activated his recorder, and then stated that the meeting had nothing to do with Plaintiff giving a statement to LVPPA. However, he proceeded

- 4 -

to ask questions about Plaintiff's statement. Plaintiff only responded that he was prepared to be counseled. Eventually, Boffelli turned off the tape recorder and the session concluded.

On August 18, 2014, Boffelli, Captain Brett Zimmerman and Deputy Chief Owens served Plaintiff with his administrative transfer order. Owens authored a memorandum explaining the reasons for Plaintiff's administrative transfer. He wrote, in relevant part:

"The transfer is being requested to further the mission of the Department, specifically SWAT Section's mission. That mission, as stated in the current version of the Section's manual is: 'Through the use of specialized tactics, training, technology and weapons, the mission of the LVMPD SWAT section is to save lives, protect people, property and rights in our community.' Sergeant Quick has lost his supervisory and global perspective which has compromised his ability to lead, manage and/or supervise within the SWAT Section. With his abilities compromised, I have determined that Sergeant Quick has rendered himself ineffective and cannot continue his tenure within the SWAT Section. . . . His actions have caused me, as well as the chain of command, to lose confidence in his ability to make decisions that will allow the Section to [fulfill its mission] . . . while maintaining a high regard for the sanctity of life." Owens additionally wrote that, after reviewing Plaintiff's taped statement, he concluded that Plaintiff "does not realize or even consider the liability incurred by the statement made by Detective Laws in reference to his social media posting" and "has not considered the global impact that retaining Detective Laws as a SWAT Team Member will have on our section or even the department." Boffelli and Plaintiff both signed the memorandum.

Plaintiff's administrative transfer was effective immediately as of August 18, 2014. He had the option to transfer either to a Patrol Sergeant position or to an Administrative Sergeant position. His pay in either position would have been lower than his pay as a Sergeant in SWAT. Additionally, the same opportunities for pay in relation to call-outs or overtime were not available in the Patrol Sergeant position as in his role in SWAT; however, patrol officers were eligible for overtime. At the time of the administrative transfer, LVMPD had a policy that officers could "re-test" for positions after a year. Despite this policy, Boffelli recommended that there was no amount of rehabilitation or retraining that Plaintiff could perform to return to SWAT.

Plaintiff did not file a grievance regarding the transfer, and voluntarily retired from the LVMPD before a transfer occurred. Plaintiff testified that since his retirement he has suffered anxiety, disappointment, depression, and nervousness.

On June 30, 2016, Plaintiff brought this suit, alleging the following: (1) Defendants violated Nevada Revised Statute ("NRS") § 50.070 by constructively discharging Plaintiff following his testimony in another officer's arbitration with the LVMPD; (2) Defendants violated his First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 by punishing him for engaging in protected speech; and (3) Defendants wrongfully terminated him in violation of Nevada public policy. (ECF No. 1). Defendants filed the instant Motion for Summary Judgment on August 29, 2017. (ECF No. 27). On October 30, 2017, Plaintiff filed a Response. (ECF No. 32). Defendants filed a Reply on November 9, 2017. (ECF No. 35). On March 19, 2018, the Court held a hearing on Defendants' Motion for Summary Judgment and took the matter under submission. This Order explains the Court's reasoning for granting the Motion for Summary Judgment.

### III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). Where the party seeking summary judgment does not have the ultimate burden of persuasion at trial, it "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its [initial] burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the

nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. If the movant fails to carry this burden of production, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. at 1102-03. But if the moving party carries its initial burden, "the nonmoving party must produce evidence to support its claim or defense." Id. at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (quotation marks omitted). However, the ultimate burden of persuasion on a motion for summary judgment rests with the moving party, who must convince the court that no genuine issue of material fact exists. Nissan Fire, 210 F.3d at 1102.

## IV. DISCUSSION

The Court begins its analysis with Plaintiff's constitutional claims and then turns to his statutory claims.

### A. Section 1983 Claims Based Upon a Violation of the First and Fourteenth Amendments

The Court does not find that Plaintiff asserts a valid claim under Section 1983 because he does not establish a violation of the First or Fourteenth Amendment. Plaintiff was speaking as a public official, upon a matter internal to the police department, when he gave a taped statement to LVPPA in preparation for Laws' arbitration hearing. Summary judgment is warranted in favor of Defendants, as there is no genuine dispute of material fact as to these issues.

#### 1. Legal Standard

"The First Amendment shields public employees from employment retaliation for their protected speech activities." Hagen v. City of Eugene, 736 F.3d 1251, 1257 (9th Cir. 2013). Courts generally follow a two-step inquiry in deciding whether a public employee's speech is entitled to First Amendment protection and, if so, whether the government should nonetheless be permitted to curtail that speech. Lane v. Franks, 134 S. Ct. 2369, 2377-78 (2014). This inquiry "requires

'balanc[ing] . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. at 2377 (alteration in original) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

The first step in this balancing inquiry "requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." Id. at 2378 (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). After determining whether the employee spoke as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Lane, 134 S.Ct. at 2378 (quoting Garcetti, 547 U.S. at 418).

In addition to the two steps set forth in Lane, the Ninth Circuit has identified two additional factors to guide courts in undertaking the First Amendment balancing inquiry: "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action[,] . . . [and] whether the state would have taken the adverse employment action even absent the protected speech." Hagen, 736 F.3d at 1257.[1]

"Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

---

[1] In Hagen, the Ninth Circuit identified five factors, the failure to meet any one of which "is fatal to the plaintiff's case," that are necessary to establish a First Amendment employment retaliation claim. 736 F.3d at 1257 (quoting Dahlia v. Rodriguez, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013)). The first, second, and fourth Hagen factors—whether the plaintiff spoke on a matter of public concern, whether the plaintiff spoke as a private citizen or public employee, and whether the state possessed an adequate justification for treating its employee differently from the general public—correspond to the steps outlined in Lane, and therefore the Court sees no need to repeat them. Nevertheless, the Court does find it useful to set forth the remaining two Hagen factors (the third and fifth factors) here, particularly given that Defendants discuss the third factor in their briefing. These factors were derived from previous Supreme Court precedent interpreting the balancing inquiry initially set forth in Pickering and were not overruled by Lane. See Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996) ("To prevail [on a First Amendment retaliation claim], an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct."). Therefore, the Court finds that these remaining Hagen factors do not conflict with the analysis set forth in Lane.

person would have known.'" Chappell v. Mandeville, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine "ensures that 'officers are on notice their conduct is unlawful' before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The qualified immunity inquiry has two prongs: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific case." Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). While the two prongs will often be decided in order, courts have discretion to decide which of the prongs should be addressed first according to the circumstances of the individual case. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

### 2. Plaintiff's Statement Does Not Meet the First Element of Lane

The Court finds that Plaintiff spoke as a public official, and his statements were regarding an internal personnel matter and not one of public concern.

First, a public employee "speaks as a private citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." Ellins v. City of Sierra Madre, 710 F.3d 1049, 1058 (9th Cir. 2013). Speech that is made pursuant to, or is mandated by, the employee's official job responsibilities is not subject to First Amendment protection. Hagen, 736 F.3d at 1257-58. In the law enforcement employment context, an employee typically speaks as an employee when reporting complaints or concerns internally according to the employer's policies, whereas communications to persons outside the workplace are generally made as a citizen. Id. at 1258. "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law." Eng, 552 F.3d at 1071.

The undisputed facts demonstrate that Plaintiff's statements focused exclusively on issues related to Laws' performance and efficacy in SWAT. These statements were made from the perspective of Plaintiff being Laws' supervisor and reflected his assessment as Laws' supervisor,

rather than Plaintiff's views as a private citizen. He opined on Laws' integrity and judgment in the context of Laws' role as a SWAT operator, and described the effect on the unit when a staff member departed either voluntarily or involuntarily. He made these comments to other law enforcement officers in the context of an anticipated arbitration regarding an employee's internal personnel grievance. These comments were clearly made pursuant to Plaintiff's official job responsibilities as Laws' supervisor, and regarding his views on the SWAT section's effectiveness in light of Laws' absence.

The circumstances in which he made the statements, as noted, are also relevant, as he provided this statement to the police union in preparation for an arbitration regarding Laws' conduct. The LVPPA detectives' questions solely focused on Plaintiff's determination of Laws' ability to perform his role as a SWAT operator, and whether Laws' conduct with regard to the Facebook post had any effect on that role. Plaintiff's answers show that he was not validating the private conduct of Laws – and in fact, Plaintiff repeatedly stated that Laws' conduct was inappropriate – but rather was opining on how that conduct would minimally affect Laws' performance as a supervisee. The detectives were asking these questions in the context of an anticipated personnel grievance arbitration.

Furthermore, the Court finds that as a matter of law[2], Plaintiff's comments regarding his evaluation of Laws' character and performance on the job did not implicate a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is . . . a subject of general interest and of value and concern to the public." Lane, 134 S.Ct. at 2380. The Court must inquire as to the "content, form, and context" of the speech. Id. at 2380 (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). Speech is generally not of public concern if it "deals with individual personnel disputes and grievances that would be of no relevance to the public's evaluation of the performance of governmental agencies . . . ." Ellins, 710 F.3d at 1057 (9th Cir. 2013) (quotation marks omitted). The Court is not persuaded by Plaintiff's argument that his statement was about

---

[2] Whether speech involves a matter of public concern is a pure question of law. Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).

inefficiency in the management and operation of SWAT which inherently is a matter of public concern. Plaintiff cites to Moonin v. Tice, in which the Ninth Circuit held that a policy emailed by an official of the Nevada Highway Patrol ("NHP") constituted a prior restraint that violated the plaintiff's First Amendment rights. 686 F.3d 853, 858 (9th Cir. 2017). As a threshold matter, the Court finds that the prior restraint in Moonin prohibiting all discussion about the NHP's K-9 program with anyone outside of the department or outside of law enforcement is distinguishable from Defendants' post hoc determination that Plaintiff's actions did not comport with LVMPD policy. Id.

The Court agrees with Defendants that Plaintiff's statement is akin to a performance review; how a particular individual performs her job is ordinarily not "a subject of general interest" or "of value and concern to the public." Lane, 134 S.Ct. at 2380. Plaintiff's statement did not represent a comment generally on the policy of LVMPD as to officers' ability to exercise their First Amendment rights. Rather, Plaintiff's statements were focused on the impact on SWAT of the loss of Laws and Plaintiff's own assessment of Laws' effectiveness as a SWAT member taking his social media posting into consideration. The Court finds that Plaintiff did not intend to make his statements to the general public or have them publicized. He intended to make his statements in the context of an internal personnel process and not as part of a public conversation to anyone outside of the LVMPD. The Court rejects Plaintiff's argument that such comments represent a matter of public concern, since such a position would convert every evaluation for a public employee into a matter of public concern simply because it would have some existential impact on the operation of the public agency.

As Plaintiff fails to establish that he spoke as a private citizen on a matter of public concern, the Court finds that he cannot maintain a First Amendment cause of action. Nonetheless, the Court will briefly discuss LVMPD's adequate justification for administratively transferring Plaintiff after he spoke to the LVPPA.

### 3. LVMPD Had an Adequate Justification for Plaintiff's Administrative Transfer

Even if Plaintiff could show that he spoke as a private citizen on a matter of public concern,

LVMPD had an adequate justification for treating Plaintiff differently than the general public in terms of its response to Plaintiff's statements. "[A] government entity has broader discretion to restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations." Moonin, 868 F.3d at 864 (alteration in original) (citation and quotation marks omitted). In determining whether a governmental entity had an adequate justification, the court must balance a public employee's interest in speaking with the State's interest in the efficiency of the services it performs via its employees. Id. at 864-865 (quoting Lane, 134 S.Ct. at 2377). The government must make a higher showing of adequacy when it seeks to deter the speech of a group of employees than when it seeks justify actions taken regarding a single employee. Id. at 865 (citation omitted).

LVMPD argues that it was concerned with Plaintiff's statements because, as a sergeant in SWAT, he was in a position of authority tasked with upholding the SWAT mission statement. LVMPD contends that a leader in the SWAT unit must understand how the incendiary comments of an individual member could compromise the mission of the unit by undermining public trust in the unit. In Boffelli's view, as expressed in the memorandum of administrative transfer, Plaintiff's statements made it clear that Plaintiff did not appreciate the impact associated with keeping Laws in the SWAT section after his inflammatory posting on social media.

Plaintiff argues that LVMPD's enforcement of its policy, albeit an informal one, punishes public criticism of LVMPD with no attempt to tailor any restrictions to legitimate interests. He concedes that LVMPD may have legitimate interests in, for example, protecting confidential investigations regarding pending criminal matters, but argues that this case does not present such valid interest.

The Court finds that the undisputed evidence suggests that LVMPD did have an adequate justification for treating Plaintiff differently and administratively transferring him. It is undisputed that the LVMPD's effective operation depends upon public trust of the LVMPD, especially in the context of operations that, like those in which SWAT engages, involve situations where civilians may be severely or fatally injured. There is also no dispute that Plaintiff, as a supervisor of a section in the SWAT unit, was in a position of influence and authority in terms of the operation of SWAT

and maintaining its public reputation. While Plaintiff's statements themselves did not opine regarding public perception of SWAT or LVMPD policies regarding officers' statements, his comments about the internal operation and accountability of unit officers do reflect a perspective that could negatively impact the mission of the unit and hence the LVMPD. The Plaintiff was not intending to make a public statement about the policies or practices of LVMPD as he intended his comments to be made exclusively in the context of a potential private personnel arbitration. The Court finds LVMPD expressed a legitimate concern that the Plaintiff's supervisory conduct and statements did not demonstrate an understanding of the importance of maintaining public trust in the operation of the LVMPD and especially the SWAT Unit. Therefore, even if Plaintiff's statements could be deemed to be those of a private citizen speaking on a matter of public concern, the LVMPD and Boffelli had a legitimate public interest in treating Plaintiff differently than the average citizen.

Finally, the Court also finds that Boffelli would be entitled to qualified immunity even if there was a constitutional violation in this case. For the reasons already noted regarding the First Amendment arguments in this opinion, the Court finds that there is not a case on point or similarly related to the facts of this case that clearly established a violation of Plaintiff's First Amendment rights. Defendant Boffelli could not have been on notice of a clearly established constitutional violation. He is therefore entitled to qualified immunity.

**B. Claim for Violation of NRS § 50.070 for Illegal Termination of a Witness**

Plaintiff asserts a claim under NRS § 50.070, which prohibits an employer from terminating an employee as a consequence for serving as a witness or prospective witness in a judicial or administrative proceeding. Defendants argue that Plaintiff cannot prevail under this statute because he was never terminated, and because the statute does not apply to voluntary interviews conducted by the union. Defendants cite to the legislative history of the statute in support of their arguments. Plaintiff argues that there is no dispute that the only reason he was removed from SWAT was because of his testimony before the LVPPA, which he characterizes as an administrative proceeding.

The Court agrees with Defendants and finds that Plaintiff cannot assert a claim for relief under NRS § 50.070. It is undisputed that Plaintiff was not terminated for interviewing with the LVPPA in anticipation of Laws' arbitration hearing. As the Court discusses below, nor was Plaintiff threatened with termination. Most importantly, Plaintiff's interview with the LVPPA is not the equivalent of a judicial or administrative proceeding. The Court is further persuaded by the legislative history of the statute. In the April 28, 1995 Minutes of the Assembly Committee on A.B. 40, prior to its adoption as NRS § 50.070, the chairperson of the subcommittee on the bill, Barbara Buckley, was asked for clarification on the term "administrative proceeding." Ms. Buckley stated: "[W]e meant administrative proceedings to be state or federal proceedings and not internal employer/employee proceedings . . . they were meant to be formal state or federal administrative proceedings." The Court finds that this statute was meant to protect witnesses or prospective witnesses testifying at quasi-judicial proceedings or hearings held pursuant to the Nevada Administrative Procedures Act, where findings of fact and conclusions of law are determined, or similar public administrative proceedings. Here, Plaintiff provided a statement to union police detectives in anticipation of an arbitration hearing pursuant to a collective bargaining agreement. The statute does not apply to the preparation of a statement to be potentially used in a private arbitration.

For these reasons, summary judgment is warranted in favor of Defendants with regard to NRS § 50.070.

**C. Claim for Constructive Discharge**

Plaintiff additionally asserts a claim for constructive discharge and wrongful termination in violation of Nevada public policy. A constructive discharge occurs when a plaintiff is subjected to working conditions so unbearable that a reasonable person in the plaintiff's position would resign. Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004) (citation omitted); see also Liston v. Las Vegas Metro. Police Dep't, 908 P.2d 720, 722 (Nev. 1995). To show a tortious constructive discharge under Nevada law, Plaintiff must establish:

> (1) the employee's resignation was induced by action and conditions that are violative of public policy; (2) a reasonable person in the employee's position at the time of resignation would have also resigned because of the aggravated and intolerable employment actions

> and conditions; (3) the employer had actual or constructive knowledge of the intolerable actions and conditions and their impact on the employee; and (4) the situation could have been remedied.

Dillard Dep't Stores, Inc. v. Beckwith, 989 P.2d 882, 885 (Nev. 1999). Defendants contend that Plaintiff's voluntary retirement is insufficient to support his claim for constructive discharge, as the administrative transfer did not create such egregious working conditions as to force a reasonable person to resign. Defendants argue that the conditions of the administrative transfer are actually unknown because Plaintiff resigned before the transfer was completed. Plaintiff cites to NRS § 50.070, NRS § 288.270(d), and the Nevada Constitution for the public policies allegedly violated by Defendants' actions. NRS § 288.270(d) prohibits termination or discrimination against an employee for signing an affidavit, petition, or complaint, or for providing testimony or being represented by an employee organization. Article 1, Section 9 of the Nevada Constitution establishes the right to free speech. Plaintiff counters that there is a question of fact as to whether a reasonable person in his position would have resigned after being administratively transferred.

The Court finds that Plaintiff does not establish a disputed fact as to a claim for constructive transfer. The undisputed evidence demonstrates that the decision to administratively transfer Plaintiff did not violate the statutory and constitutional provisions upon which he relies. As discussed above, Plaintiff was not a witness in a judicial or administrative proceeding, and was not terminated or threatened with termination for such service in violation of NRS § 50.070. None of the actions described in NRS § 288.270(d) are applicable in this case. Plaintiff's free speech claim under the Nevada Constitution fails for the reasons described above. Plaintiff can establish no violation of public policy on the disputed or undisputed facts in this case. Therefore, summary judgment is granted in favor of Defendants on the constructive discharge claim.

/ / /

/ / /

/ / /

**V.     CONCLUSION**

For the reasons stated above,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 27) is GRANTED.  The Clerk of Court is instructed to close this case.

DATED: March 31, 2018.

**RICHARD F. BOULWARE, II**
**United States District Judge**